IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

LIZETTE VARGAS, et al.              :
                                     :          CIVIL ACTION
        v.                           :          No. 11-2639
                                     :
CITY OF PHILADELPHIA, et al.         :
                                     :

O'NEILL, J.                                              November 18, 2013

## MEMORANDUM

Before me is a motion for summary judgment by defendants the City of Philadelphia and police officers Keith White and Matthew Blaszczyk on the claims made by plaintiff Lizette Vargas, individually and as administratrix of the estate of her deceased daughter Tabitha Gonzalez. Gonzalez suffered from an asthma attack on the night of August 19, 2009 which caused her severe anoxic brain injury. She was pronounced brain dead and taken off of life support six days later on August 26, 2009. Plaintiff alleges that the two defendant police officers prevented her and others from transporting her daughter to nearby Temple University Hospital for emergency care while she was suffering from the asthma attack, thereby fatally delaying her access to crucial medical treatment. Plaintiff also alleges that the City of Philadelphia's policy, custom, and failure to train its police officers led to violations of plaintiff and decedent's constitutional rights. For the following reasons, I will grant defendants' motion for summary judgment.

## BACKGROUND

### I.      Night of August 19, 2009

On the night of August 19, 2009, 15-year old Gonzalez began suffering from an asthma attack while at her home in North Philadelphia. Dkt. No. 12-4 at 86:16-19. Her mother plaintiff

Lizette Vargas later found her lying on the ground on the sidewalk in front of the house. Dkt. No. 12-4 at 88:22-89:10. Erik Franklin, the boyfriend of Maritza Rojas, and two neighbors lifted Gonzalez into the backseat of a car belonging to Julia Diaz, another cousin of Gonzalez. Dkt. No. 12-4 at 94:9-95:20. During this time, plaintiff and Diaz both dialed 911 and placed five separate calls between 12:08 a.m. and 12:14 a.m. Dkt. No. 12-18 at 16:12-19. Police Communications Center dispatched defendant police officers Keith White and Matthew Blaszczyk, both in the same car, in response to reports of "a person screaming" on the call made at 12:10 a.m. and 40 seconds. Dkt. No. 12-18 at 25:8-20. Neither officer was made aware that the call was regarding a medical emergency.[1] Dkt. No. 12-7 at 12:17-19, 13:5-14; Dkt. No. 11-5 at 20:14-23. While en route at 12:13 a.m. and 42 seconds, the officers ran separate tags of two different vehicles. Dkt. No. 11-5 at 40:19-41:10; 43:5-10. The officers arrived on the scene at 12:13 a.m. and 56 seconds.[2] Id. at 45:15-17. By the time of their arrival, it is undisputed that Gonzalez was unconscious and that she remained unconscious throughout the time that the officers were on location that night. Dkt. No. 11-6 at 42:5-10.

The events immediately following officers White and Blaszczyk's arrival are in dispute. Plaintiff testified that Franklin was in Diaz's backseat with Gonzalez while plaintiff was in the

---

[1]     "Call-takers" receive 911 calls from individuals while "dispatchers" are in communication with the police but not the individual. "Call-takers" and "dispatchers" are not in communication with each other but both access the same information on a computer. Computer-Aided Dispatch (CAD) records indicate that at 12:10 a.m. and 40 seconds, the automated computer system recognized and cross-referenced plaintiff's call in regards to a medical emergency and her other call where she was screaming. The computer cross-reference is known to the call-taker, but it is impossible to ascertain whether the dispatcher was also aware of the cross-reference and communicated this information to the police officers. Dkt. No. 11-5 at 33:24-36:8. Officer White testified that the information the officers had when responding to the scene was that there was a person screaming. Dkt. No. 11-6 at 13:9-18.

[2]     The time of the officers' arrival is captured and reported to the remote dispatcher when they push a button on their mobile data terminal (MDT) that is secured to their vehicle; a "slight" delay between the officers' actual arrival and the recorded time of their arrival is possible. Dkt. No. 11-5 at 52:20-53:17; 56:9-14.

passenger front seat and Diaz, as the driver, had pulled the car "halfway" out of its parking spot when officers White and Blaszczyk parked their car parallel to the car that plaintiff was in. Dkt. No. 11-4 at 95:23-97:10; Ex. D-1. According to plaintiff, the officers' parked car was positioned so that its back door blocked her from opening her passenger-side door. Dkt. No 11-4 at 98:4-8; Ex. D-1. She claims that she then banged on her door to "let [the officer] know that [she] can't open up the door" while Diaz rolled down her window to tell the officer that they had Gonzalez in the car and "got to go." Dkt. No. 11-4 at 98:4-14. Plaintiff testified that the first officer[3] to exit the patrol car walked in front of Diaz's car to the driver's side and while walking, told the occupants to "get the fuck out of the car, turn off the engine now" as Diaz was trying to explain to him their medical emergency. Id. at 98:14-99:5; 103:8-17. Diaz turned off the engine and, along with the rest of the passengers, exited the car, leaving Gonzalez propped against the car backseat.[4] Id. at 103:18-105:12; Dkt. No. 12-6 at 31:19-33:2. At this point, plaintiff claims that the police officer pulled open the backseat door that Gonzalez's legs were leaning against, causing half of her body from the torso downwards to tumble outside onto the ground.[5] Dkt. No. 11-4 at 103:21-104:3; Dkt. No. 12-6 at 33:3-34:7. According to plaintiff, she attempted to move towards her daughter but was prevented from doing so by the officer who "blocked" her. Dkt. No. 11-4 at 108:2-109:13.

In contrast to plaintiff's version of events, officers White and Blaszczyk testified that they were not blocking any cars when they pulled onto the street of the Vargas residence. Dkt.

---

[3]     Plaintiff testified that he was tall and blonde and was the driver of the police vehicle. Dkt. No. 11-4 at 98:17-19; 101:7-12; 103:4-7.
[4]     Plaintiff claims she had to climb over the driver's seat to exit the car since the officers' patrol car was parked in a way that block her from opening her passenger side door. Dkt. No. 11-4 at 104:17-105:1.
[5]     Franklin claims he witnessed the police officer opening the backseat door. Dkt. No. 11-2 at 31:17-18.

No. 12-9 at 7:16-18; Dkt. No. 12-7 at 22:10-14. They also claim that Gonzalez was already on the sidewalk upon their arrival: Officer Blaszczyk testified that he saw "a female laying on the sidewalk" as he exited his vehicle and similarly Officer White claimed to have observed that there were "two Hispanic males that were over top of a[ ] Hispanic female who was on the ground." Dkt. No. 12-9 at 7:23-8:1; Dkt. No. 11-6 at 20:15-17. The officers assert that along with the two Hispanic males they attempted to move Gonzalez back into the car and "got her halfway into the car and she just didn't fit into the back door." Dkt. No. 11-6 at 21:11-18; Dkt. No. 12-9 at 9:18-22. Officer White recalls that as they were attempting to move Gonzalez into the car he heard the siren of an ambulance coming and "it was very clear [to him] that [they] were not going to get her [Gonzalez] into the back of the car and [so he] recommended that [they] wait for the ambulance to arrive." Dkt. No. 11-6 at 21:20-24. Officer White further explained that "as the ambulance was pulling up, the two females were screaming at [them] that [they] don't want to fucking help, to get the fuck away from her [Gonzalez]." Id. at 24:13-15. Officer White claims he stepped away from them and approached the ambulance as it arrived on location. Id. at 24:15-17. Officer also testified that during the time he and officer White were attempting to help transport Gonzalez he was told "just get the fuck out of here. Get the fuck off of her [Gonzalez]. Get the fuck out of here. We don't want your help." Dkt. No. 12-9 at 9:8-11. Both officers assert that they did not prevent anyone from taking Gonzalez to the hospital. Dkt. No. 11-6 at 49:8-13; see Dkt. No. 12-9 at 19:12-23. Both officers acknowledge that at no time that night did they have a reasonable suspicion that there was any criminal activity at the location. Dkt. No. 11-6 at 35:14-22; Dkt. No. 12-9 at 15:22-16:2.

Franklin testified that the officers were on scene for less than a minute before the first group of EMTs arrived: "Right when the cop came and opened the door, not even a minute later,

that's when the rescue and the fire department and everything came." Dkt. No. 11-2 at 34:19-35:1. Franklin's estimation is in line with EMT records which show that the first group of responders arrived on scene at 12:14 a.m. and 37 seconds, less than one minute after White and Blaszczyk's arrival. Dkt. No. 11-9 at 22:3-5. The first group of responders arriving in a fire truck recollected that they saw a large crowd of people at the scene who were "screaming, hollering, fighting" "amongst each other" and also that Gonzalez was "half-in" the car and was unresponsive with no vital signs. Dkt. No.11-10 at 9:22-10:6; Dkt. No. 11-11 at 16:2-17:13. The first responders pulled Gonzalez out of the car and onto the sidewalk, provided basic life support and CPR to her until the medic unit came in an ambulance, assisted her onto a stretcher, loaded her into the ambulance and continued providing CPR to her on the way to Temple University Hospital. Dkt. No. 11-11 at 16:2-9. Gonzalez arrived at the hospital at 12:28 a.m. and 31 seconds, approximately twenty minutes after plaintiff's first call to 911. Dkt. No. 11-9 at 28:10-11. She had suffered a severe anoxic brain injury by the time of her arrival, was pronounced brain dead, taken off of life support and died two weeks later on August 26, 2009. Dkt. No. 12-3 at ¶¶ 22-24.

Plaintiff claims defendants violated both her and the decedent Gonzalez's constitutional rights to be free from unlawful seizure and physical restraint. Id. ¶¶ 25, 28. Additionally, plaintiff claims a violation of her fundamental liberty interest in the care, custody and management of her child, and the decedent's right to her well-being, life and personal security. Id. ¶¶ 25, 28. Finally, plaintiff alleges that the City of Philadelphia's failure to train its police officers or, in the alternative, its policy and customs in allowing its police officers to disregard family and/or parental rights and individuals' right to seek emergency medical treatment, constitute an injury for which it is responsible under 42 U.S.C. § 1983. Id. ¶¶ 33-34.

**II.    The City of Philadelphia Police Department Policies and Practices**

The City of Philadelphia policies that are relevant to plaintiff's claims are found in the

Philadelphia Police Department Directive 63 of March 3, 1996 on "Hospital Cases"[6] and an

appendix, Memorandum 99-2 of January 29, 1999[7] titled "The Duty of Police Officers to

Identify and Facilitate Medical Care for Persons Found in Semi-Conscious or Unconscious

Condition as a Result of Epilepsy, Diabetes or Other Illness."  Dkt. Nos. 12-23, 12-24.

Memorandum 99-2 states that "persons found in semi-conscious or unconscious condition or

---

[6]     Directive 63 provides as follows:

I. Policy:
A.  Police personnel will consider the assignment of a hospital case an
    emergency unless advised otherwise by a medically competent
    person. First aid will be rendered and the person transported to the
    nearest hospital.
B.  Police personnel assigned to radio patrol cars will, whenever
    possible, without detriment to the person, handle hospital cases to
    ensure availability of emergency patrol wagons for other
    assignments.
C.  The Philadelphia Police Department will not Dispatch police
    officers to the scene of hospital cases when Fire/Rescue responds
    except in the following circumstances:
    1.  When requested by Fire Communications.
    2.  Hospital cases arising from criminal acts, auto
        accidents or any other instances in which a police
        investigation/action is required.
II. Procedure
A.  Police personnel will transport:
    1.  Persons suffering from a serious penetrating wound,
        e.g., gunshot, stab wound, and similar injuries of the
        head, neck, chest, abdomen, and groin to the nearest
        accredited trauma center. Transportation of such
        cases will not be delayed to await the arrival of Fire
        Department paramedics.

Dkt. No. 12-23.

[7]     Memorandum 99-2 was updated in 2010.  Memoranda are "put out momentarily,
for maybe a year" while Directives are memoranda that are current or will continue to be current.
Dkt. No. 11-7 at 12:9-13:12.  Memorandum 99-2 was a "permanent" memorandum attached as
an appendix to Directive 63.  Id. at 13:9-12.

-6-

exhibiting symptoms due to epileptic or diabetic illness shall immediately be transported to a hospital for treatment by a physician." Memorandum 99-2 is based upon a Pennsylvania General Assembly Act that imposes obligations on police officers prior to charging individuals with a crime.[8]

According to Sergeant Paul Starrs[9] of the Research and Planning Unit for the Philadelphia Police Department, City police are trained in the police academy to recognize medical emergencies including emergencies such as an asthma attack. Dkt. No. 11-7 at 14:19-15:20. Starrs testified that upon finding an unconscious individual it is at the discretion of the police officer whether to transport the individual to the hospital or to wait for the arrival of EMT.[10] Id. at 23:6-14. There is no City policy that prohibits police officers from transporting

---

[8]    Memorandum 99-2 erroneously cites to Pennsylvania General Assembly statute 35 P.S. § 10011. The correct provision § 10012 titled "Law enforcement officers; duty upon finding unconscious persons" states:

> It shall be the duty of all law enforcement officers in this State to make a diligent effort to determine if any person they may find in a semi-conscious or unconscious condition is an epileptic or a diabetic or a person who is suffering from any other type of illness which would cause semi-consciousness or unconsciousness, before such person may be charged with a crime. If any law enforcement officer shall determine that such a person is actually suffering from an affliction which would cause semi-consciousness or unconsciousness, it shall be his duty to notify such person's physician immediately or to have such person immediately transported to a physician or to some facility where the services of a physician are available.

35 Pa. Cons. Stat. § 10012 (2013) (emphasis added).

[9]    Starrs is responsible for writing Police Department policies, procedures and recommendations. Dkt. No. at 9:17-22.

[10]    Starrs testified that:

> [Memorandum 99-2] doesn't necessarily say that [officers coming upon an unconscious individual are required to transport her to the hospital]. It says, will render first aid, and that decision may be

the suffering individual to the hospital, but police officers driving and seated in the front of the car would otherwise leave the individual unattended and officers are according to Starr "better off" "waiting for the medics and that's why [officers are] trained to wait for the medics because they have the equipment and they have the personnel to ride in the back [with the individual]." Id. at 23:18-24:3. Starrs is "not aware of any policies or procedures" or "training" that pertains specifically to "parents' right to the care, custody, control and medical treatment of their children." Id. at 28:15-23.

Officer White claims that he is familiar with Directive 63 and understood it as requiring him to render first aid to individuals where "appropriate" at the scene. Dkt. No. 11-6 at 39:7-12. Both officers White and Blaszczyk are trained in first response and CPR. Id. at 56:13-18. Officer White testified that he was given specific instructions in his first responder and CPR trainings that individuals should be transported to the hospital when suffering from an asthma attack. Id. at 57:14-19. He claims that he did not attempt to transport Gonzalez in the police vehicle because generally, police vehicles "are smaller in the back" than the vehicle which he was already having trouble moving Gonzalez into. Id. at 46:16-49:5. He did not attempt to render first aid to Gonzalez. [11] Id. at 39:14-16. He alleges that he was focused on "trying to put [Gonzalez] inside a vehicle . . . and then an ambulance was heard and seen coming to the location within a minute to two minutes. [The first responders] are better trained for the

---

> based on what's going on on the scene, what the officers have available to them to transport, and we're always taught at the Academy that . . . the medics, the paramedics have more equipment available to render first aid.

Dkt. No 11-7 at 20:18-21:2; see Dkt. No 11-7 at 20:10-23:2.

[11] Officer White testified that "never had a chance" to check whether Gonzalez was breathing because while attempting to help move Gonzalez into the vehicle, an "elderly female had grabbed [him] from behind and was screaming at [him] to leave" Gonzalez alone. Dkt. No. 11-6 at 42:11-21.

situation." Id. at 47:11-18.

## STANDARD OF REVIEW

Summary judgment will be granted against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The party moving for summary judgment bears the burden of demonstrating that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); see Celotex, 477 U.S. at 322–23. If the movant sustains its burden, the nonmovant must set forth facts demonstrating the existence of a genuine dispute. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). A dispute as to a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Id. A fact is material if it might affect the outcome of the case under governing law. Id.

To establish that a fact cannot be or is genuinely disputed, a party must:

> (A) cit[e] to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) show[ ] that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). The adverse party must raise more than a mere scintilla of evidence in its favor in order to overcome a summary judgment motion and cannot survive by relying on unsupported assertions, conclusory allegations, or mere suspicions. Williams v. Borough of W. Chester, 891 F.2d 458, 460 (3d Cir. 1989). The existence of disputed issues of material fact should be ascertained by resolving all inferences, doubts and issues of credibility against the

movant.  Ely v. Hall's Motor Transit Co., 590 F.2d 62, 66 (3d Cir. 1978) (citations and quotation marks omitted).  Summary judgment will be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex, 477 U.S. at 322.

## DISCUSSION

**I.      Counts I and II—Violations of Constitutional Rights**

    **A.      Seizure**

Plaintiff alleges that both she and decedent were unlawfully seized in violation of their Fourth Amendment rights.  Dkt. No. 6 at ¶¶ 26, 29.  For the reasons below, I do not find that either plaintiff or decedent was seized.

A Fourth Amendment seizure occurs only where the government terminates the freedom of an individual through means intentionally applied.  Brower v. Cnty. of Inyo, 489 U.S. 593, 597 (1989).  "A person is 'seized' only when, by means of physical force or a show of authority, his freedom of movement is restrained."  United States v. Mendenhall, 446 U.S. 544, 553 (1980).  The Mendenhall test for the existence of a 'show of authority' is an objective one and requires that I consider "not whether the citizen perceived that he was being ordered to restrict his movement, but whether the officer's words and actions would have conveyed that to a reasonable person."  California v. Hodari D., 499 U.S. 621, 628 (1991).  Shows of authority that may constitute a seizure to a reasonable person include "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled."  United States v. Crandell, 554 F.3d 79, 85 (3d Cir. 2009), citing Mendenhall, 446 U.S. at 554–55 (internal citations omitted).

Additionally, submission to a 'show of authority' is required for a seizure to have been effected. Mendenhall, 446 U.S. at 554–55; see also United States v. Smith, 575 F.3d 308, 313 (3d Cir. 2009) ("The simple act of an assertion of authority by an officer is insufficient to transform an encounter into a seizure without actual submission on the part of the person allegedly seized."). Determining whether an encounter constitutes a seizure requires consideration of the totality of the circumstances. Florida v. Bostick, 501 U.S. 429, 437 (1991). As Mendenhall observed, a 'seizure' occurs only when "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." Mendenhall, 446 U.S. at 554–55. Where plaintiff could have "reasonably understood that she was free to leave" a seizure does not exist. Gause v. City of Phila., No. 00-1052, 2001 WL 1251215, at *2 (E.D. Pa. Sept. 27, 2001).

Plaintiff claims that she was seized when the first police officer "blocked" and prevented her from moving towards Gonzalez and that plaintiff submitted to the officer's show of authority. Dkt. No. 12 at 27-30. Plaintiff describes her encounter: "What I mean by blocking, he didn't put his hands on me. He just blocked like, you know, you can't go over there, you got to move back and that's when I started screaming and yelling . . . ." Dkt. No. 11-4 at 108:2-8. She further elaborates:

> What I mean by blocking was that he put his arms like you can't go that way; even though I tried to move that way, he wouldn't let me go. Not block me like he shoved me or anything like that, he didn't . . . . What I am saying is, here I am and I'm trying to walk and here he is telling me no and like—just on me like. You can't go back there, ma'am. You have to calm down. You can't go back there.

Id. at 109:4-13.  When asked whether the officers said anything else to her, she said: "Besides that they didn't want me to get next to her and wait for the ambulance that was on its way.  I moved away from them after that."  Id. at 118:10-14.

Plaintiff admits that officer White did not physically touch her during the encounter where she claims she was seized.  His language and words to her specifying that she should "calm down" and not "go back there" do not evidence a seizure.  Id. at 109:4-13.  Plaintiff's testimony with respect to her subsequent behavior where she "moved away" from the officers suggests that she was free to leave the area and was only precluded from moving into the area where Gonzalez lay.

In Gause, the plaintiff was physically struck by an officer and knocked to the ground while observing her son being arrested by police.  Gause, 2001 WL 1251215, at *2.  The plaintiff's son testified that while the police were arresting him, they told his mother to leave the area.  Id.  At no time did the police attempt to arrest the plaintiff.  Id.  The District Court concluded that "[b]ecause a reasonable person in [p]laintiff's position would have reasonably understood that she was free to leave, a 'seizure' did not occur."  Id.  In Gause, the plaintiff was free to move anywhere with the exception of the area where her son was being arrested.  Similarly here, plaintiff was free to move anywhere except into the area where Gonzalez lay.  A reasonable person would have understood that she was free to leave the area and plaintiff apparently did because she admits that she "moved away from them [officers] after that."  Dkt. No. 11-4 at 118:10-14.  Therefore, I find that there was no seizure of plaintiff.

Plaintiff also claims that Gonzalez was seized by the officers.  Gonzalez was unconscious by the time of the officers' arrival.  Dkt. No. 11-6 at 42:1-10; Dkt No. 12-5 at 14:7-17:17; see Dkt. No. 11-4 at 92: 4-6.  At issue is whether an individual who is unconscious is capable of

being "seized" for the purposes of the Fourth Amendment.  While the parties have not directed the Court to any Court of Appeals authority relevant to this question, other circuits have ruled that an unconscious individual cannot be seized.

The Court of Appeals for the Seventh Circuit has found there to be no seizure when a plaintiff's failure to flee in response to a show of authority was a result of his being asleep or unconscious.  Leaf v. Shelnutt, 400 F.3d 1070, 1090 (7th Cir. 2005).  In Leaf, two police officers entered the plaintiff's house and conducted a search lasting approximately three minutes while the plaintiff was lying on a bed with his eyes closed.  Id. at 1075.  In examining whether the plaintiff was seized, the Court emphasized that the "seizure must be accomplished 'through means intentionally applied' [and] it is not the case that a seizure occurs every time there is a 'governmentally desired termination of an individual's freedom of movement.'"  Id. at 1090 citing Brower, 489 U.S. at 597 (emphases in original).  The Court further observed that "[w]here police seek to stop someone, but the subject is 'in fact stopped . . . by a different means' no seizure occurs."  Id., citing Brower, 489 U.S. at 597.  The Court concluded that if the plaintiff's "failure to flee can be attributed to the fact that he was asleep or otherwise unconscious," "it cannot be said that the officers terminated his freedom of movement through their show of authority."  Id.

The Court of Appeals for the Sixth Circuit has adopted a similar position.  Peete v. Metro. Gov't of Nashville & Davidson Cnty., 486 F.3d 217, 217 (6th Cir. 2007).  In Peete, the Court emphasized that a "seizure" connotes "an intentional interference with a person's liberty by physical force or a show of authority that would cause a reasonable person consciously to submit."  Id. at 220.  The Court held that because the plaintiff was in an unconscious epileptic state at the time of his encounter with the defendant emergency medical personnel he "could not

perceive any restraint on his liberty or otherwise feel compelled to submit to a governmental show of force" and therefore was not seized within the meaning of the Fourth Amendment. [12] Id. at 217.  In so concluding, the Court reiterated that "the question whether a seizure has occurred within the meaning of the Fourth Amendment is an objective one."  Id. at 220.

Defendants argue that there was no seizure of Gonzalez within the meaning of the Fourth Amendment because she could not have "consciously" submitted to any show of authority.  See Dkt. No. 11 at 11.  Here, defendants misconstrue the word "consciously" as used by the Sixth Circuit in Peete to suggest that an individual necessarily needs to perceive or be aware of a show of authority in order to submit.  See id.  This is not the case.  As plaintiff correctly points out, the Mendenhall test for the existence of a show of authority is an objective one that does not focus on what an individual perceives.  Hodari D., 499 U.S. at 628.  The decisions in Leaf and Peete apply the objective standard because where there is no individual submission to or no submission because of a show of authority the required causality between the two prongs of the Mendenhall test is not established.  See James v. City of Wilkes-Barre, 700 F.3d 675, 681–82 (3d Cir. 2012),

---

[12]        Contrary to plaintiff's argument, the fact that the responding personnel were emergency medical technicians and not police officers in Peete as they are in the case before me, is not a key distinction between Peete and the instant case.  See Dkt. No. 12 at 24.  In a subsequent case, the Sixth Circuit held that "we will assume without deciding that Peete's holding could extend to defendant police officers." McKenna v. Edgell, 617 F.3d 432, 439 (6th Cir. 2010), cert. denied, 179 L. Ed. 2d 654 (2011).  In Browell v. Davidson, 595 F.Supp.2d 907, 916 (N.D. Ind. 2009), a case deciding whether a hostage passenger in a fleeing car was seized, the Court held that:

> for purposes of the Fourth Amendment analysis it is important to note that she was unconscious.  It is undisputed [that] [plaintiff] does not recall any of the events involving the police leading up to her transport to the hospital.  [Plaintiff] was not even aware of the police being present, and was surely not aware of her inability to leave. Thus, [plaintiff] could not perceive any restraint on her liberty or otherwise feel compelled to submit to a governmental show of force.

citing <u>Kernats v. O'Sullivan</u>, 35 F.3d 1171, 1180 (7th Cir. 1994) ("[a] seizure typically involves an almost complete restriction of movement—either a laying of hands or a close connection (both temporally and spatially) between the show of authority and the compliance.").

Because the plaintiff in <u>Peete</u> was unconscious, he could not establish that his submission was in response to a show of authority. He therefore could not have been seized. Similarly, in his slumbering or unconscious state the plaintiff in <u>Leaf</u> could not have attempted to flee; because the restriction on his movement was caused by a prior state; the officers could not have been said to have terminated his freedom through their show of authority. In both <u>Peete</u> and <u>Leaf</u> no seizure was found because the plaintiff's unconscious state prevented him from fulfilling the causality required of a seizure, not because the plaintiff's unconscious state prevented him from <u>perceiving</u> the officer's show of authority. While the consequence is that an unconscious individual cannot be seized under the Fourth Amendment whether the correct objective test or erroneous 'subjective' test is used, under other circumstances the outcome will differ.

In this case Gonzalez was "unresponsive" to CPR and "not breathing" even prior to the officers' arrival. Dkt. No 12-5 at 14:7-17:17. Since she continued to be unconscious and nonresponsive throughout the time the officers were on scene, I find that Gonzalez could not have been seized.

Plaintiff then argues that because she was asserting her parental right to the care, custody, and control of her daughter at the time of her daughter's alleged seizure, she as a "proxy" submitted Gonzalez to the authority of the defendant police officers. Dkt. No. 12 at 24. I find this argument unavailing. There is no caselaw suggesting that submission to a show of authority is anything but individual or can be satisfied by proxy. While plaintiff attempts to invoke the doctrine of third party standing to assert a violation of her daughter's right, that doctrine has no

applicability to the question of whether her daughter's right was violated to begin with. Unfortunately, here plaintiff confuses the requirement of having suffered a constitutional violation with the general doctrine of standing which allows a third party under certain circumstances to assert the legal rights of another. See Kowalski v. Tesmer, 543 U.S. 125, 130 (2004).

I find that because Gonzalez in her unconscious state was incapable of submitting to any show of authority she was not seized. I therefore will not discuss whether plaintiff has standing to assert Gonzalez's right to be free of an unlawful seizure.

**B.     Liberty Interest**

Plaintiff asserts that decedent's liberty interest was violated by the defendant officers precluding her family from transporting her to the hospital for emergency care. Dkt. No. 12 at 32-34. Plaintiff also claims that the officers violated her fundamental liberty interest in the care, custody and management of her child when they prevented her from transporting her daughter to the hospital. Id. at 30-32. Finally, plaintiff asserts that both her freedom and the decedent's freedom from physical restraint were violated. Dkt. No. 6 at ¶¶ 26, 29. Plaintiff has not elaborated on the specifics of the last allegation, but "freedom from bodily restraint and punishment is within the liberty interest." Ingraham v. Wright, 430 U.S. 651, 652 (1977). All claims here are therefore analyzed under the Due Process Clause of the Fourteenth Amendment that protects against the arbitrary actions of government, whether in a denial of fundamental procedural fairness or in the exercise of power without reasonable justification in the service of a legitimate governmental objective. Cnty. of Sacramento v. Lewis, 523 U.S. 833, 846 (1998).

To establish a substantive due process claim under 42 U.S.C. § 1983 a plaintiff must prove that: 1) the particular interest at issue is protected by the Fourteenth Amendment, and; 2)

the government's deprivation of that protected interest "shocks" the conscience. <u>Gottlieb ex rel. Calabria v. Laurel Highlands Sch. Dist.</u>, 272 F.3d 168, 171–72 (3d Cir. 2001). Plaintiff's interests here are protected by the Fourteenth Amendment, but because I find that the officers' conduct does not rise to the level of action that 'shocks the conscience' I will grant summary judgment in their favor.

The Supreme Court in <u>Lewis</u> noted that "conduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level." <u>Lewis</u>, 523 U.S. at 846, 849. At the same time, "[l]iability for negligently inflicted harm is categorically beneath the threshold of constitutional due process." <u>Id.</u> at 848. Applying <u>Lewis</u>, the Court of Appeals has held that "more culpability is required to shock the conscience to the extent that state actors are required to act promptly and under pressure." <u>Schieber v. City of Phila.</u>, 320 F.3d 409, 419 (3d Cir. 2003). In situations such as a high-speed chase demanding an "instant judgment" a heightened level of culpability amounting to an "intent to harm" is required before such behavior can be said to shock the conscience. <u>Lewis</u>, 523 U.S. at 853–54. Other situations may not demand an instant judgment but nonetheless necessitate the state actor to operate under time pressure. In such situations the culpability required needs to "reach a level of gross negligence or arbitrariness that indeed 'shocks the conscience.'" <u>Miller v. City of Phila.</u>, 174 F. 3d 368, 375–76 (3d Cir. 1999). For liability to attach in these circumstances a plaintiff must show that "defendants consciously disregarded, not just a substantial risk, but a great risk that serious harm would result." <u>Ziccardi v. City of Phila.</u>, 288 F.3d 57, 66 (3d Cir. 2002).

In the present case, the officers were acting under time pressure. They had at most three to four minutes according to plaintiff, if not less than one minute according to EMT records and

plaintiff's witness, to make a decision regarding Gonzalez's care in the interim period prior to the arrival of emergency personnel. Dkt. No. 11-4 at 115:4-19; Dkt. 11-5 at 35:2-4; Dkt. No. 11-9 at 22:3-4. In addition to Gonzalez's medical emergency, the officers also had to concurrently contain a growing crowd of onlookers on the scene who had crossed over from the nearby park in response to plaintiff's screams and neighbors who wanted to "find out what was going on."[13] Dkt. No. 11-4 at 111:18-112:4. The facts are disputed whether police officers Blaszczyk and White blocked plaintiff from accessing her daughter and transporting her to the hospital. But construing the facts in a light most favorable to the plaintiff, even if the officers were found to have done so, I find that they did not intend to injure Gonzalez, and at no time consciously disregarded a great risk of serious harm to her.

At the time that the officers pulled their car alongside Diaz's car and allegedly blocked the passengers inside from leaving the curb, they were responding to a report of a "person screaming" and there is no evidence that they were aware of a medical emergency. See supra n.1. Later, if an officer was blocking plaintiff from accessing her daughter, plaintiff admits that it was likely because she was in a hysterical state.[14] Dkt. No. 11-4 at 108:9-16. Another

---

[13]     Plaintiff said that the other officer was "trying to get people to move away because it was a big crowd" and that "[a] lot of people from the park crossed over. Probably like ten, 15 people." Dkt. No. 11-4 at 111:18-112:4. Similarly, Robert Green, a firefighter and EMT who arrived on scene after the officers, testified that he wrote in his narrative report that night that there was "resistance from onlookers at the scene" and that it was a "growing volatile situation at the scene" although he had not personally felt threatened that night. Dkt. No. 12-10 at 6:15-17, 15:6-22, 16:9-18. Another firefighter/EMT, Noel Bermudez testified that there was a "crowd of people" at the scene and that a police officer was "trying to control the scene." Dkt. No. 12-12 at 7:22-8:4.
[14]     Plaintiff speculates that her behavior and physical disruption at the scene were the cause of the officer's response. She states:

> I guess because I was jumping up and down and I was screaming
> and yelling and I was trying to get to my daughter [that the police]
> had me on the other side" and "maybe I was jumping and moving

bystander who was not in the same hysterical state as plaintiff was able to move into the area where Gonzalez lay and fix her clothing.[15]  Officer White recognized that Gonzalez was having a medical emergency and needed immediate transportation to the hospital.  Dkt. No. 11-6 at 38:3, 39:15, 40:6-7.  During this period of time, the officers chose to wait for the first responders rather than allow Gonzalez to be transported in the back of a car.  Their decision to wait for the first responders is reasonable in light of their belief that emergency medical personnel were better positioned to assist Gonzalez.  Dkt. No. 11-6 at 17:11-15.  The officers' decision to wait was mirrored by the first responders who, arriving shortly after, also decided against assisting plaintiff in transporting her daughter to the hospital "because the medic unit was around the corner and she would be getting . . . professional care in an ambulance" that she presumably would not in the back of Diaz's car.  Dkt. No. 11-11 at 38:5-23.

Viewed in light of the circumstances prevailing during the incident, I find that plaintiff has not shown that the officers' actions rise to a level that would  'shock the conscience.'  I find that the officers' decision in light of the exigent circumstances did not suggest a conscious disregard of a great risk of serious harm to Gonzalez.  I will therefore grant summary judgment in favor of defendants with respect to plaintiff's claim that their actions violated her substantive due process rights.

---

around and that's why he [officer] was holding me back from
going that way [towards Gonzalez].

Dkt. No. 11-4 at 108: 9-16.

[15]  Rojas testified that her boyfriend Franklin, despite also being told by one or more of the officers to refrain from "going over to [Gonzalez]" and to "not touch [Gonzalez]" ignored the warning and was able to go to where Gonzalez lay and "fixed her up" so that her undergarment would not be exposed while she was lying on the sidewalk.  Dkt. No. 11-3 at 29:4-16.

Plaintiff's frustration with the officers appears to be that they did not proactively assist her in transporting Gonzalez to the hospital or affirmatively 'help' her in the manner that she wanted.[16]  However, the Supreme Court has explicitly held that the Due Process Clause confers "no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty or property interests of which the government itself may not deprive the individual." DeShaney v. Winnebago Cnty. Dep't of Soc. Servs., 489 U.S. 189, 196 (1989).  I find that the officers' lack of an affirmative response to Gonzalez's emergency does not violate plaintiff's rights under the Due Process Clause.

### 1.    Special Relationship Exception

Plaintiff next argues that in the alternative, a 'special relationship' existed to create an affirmative obligation on the part of defendant officers to assist both her and decedent.  Dkt. No. 12 at 34-36.

While the Due Process Clause generally imposes no affirmative duty on the state to protect an individual, a 'special relationship' exception exists where a state holds an individual in custody under circumstances such as incarceration, institutionalization, or other similar restraints

---

[16]    When asked "why do you feel that the police are responsible for what happened" plaintiff explained:

> I feel as though they could have helped me get [Gonzalez] to [the] hospital.  Plenty of times I've gotten asthma before and plenty of times [police] have helped me get to the hospital on time . . . . [But during this incident] [officers White and Blaszcyzk] just stood there and didn't give [Gonzalez] no CPR, didn't go next to her, didn't—I didn't see no kind of reaction from them to say, okay, this is a 15-year old on the floor, we need to help her.  You know, at other times I've seen cops help.  All [officers White and Blaszcyzk] did was [to] say everybody's got to get away and move back and wait [for help].

Dkt. No. 11-4 at 117:1-22.

on the individual's freedom to act on his own behalf.  DeShaney, 489 U.S. at 199–200.  The

Supreme Court clarified in DeShaney that in such situations an "affirmative duty to protect arises

not from the State's knowledge of the individual's predicament or from its expressions of intent

to help him but from the limitation which it has imposed on his freedom to act on his own

behalf."  Id. at 200.  "Restrictions on a person's liberty to protect him-or herself from danger are

the lynchpin of DeShaney."  Morrow v. Balaski, 719 F.3d 160, 193 (3d Cir. 2013).  In this case it

is undisputed that Gonzalez was unconscious and/or nonresponsive by the time of the officers'

arrival.  Defendant officers could not have imposed upon her a restriction to act on her own

behalf where she was in a state of incapacity.  Consequently, I find that no 'special relationship'

was created that would require the officers to affirmatively aid Gonzalez.

### 2.        State-Created Danger Doctrine

Plaintiff also argues that the officers' actions created the danger of plaintiff's injury and

therefore that they had an affirmative duty to aid her.  Dkt. No. 12 at 36-45.

The State has a duty to protect when it "acts in a way that makes a person substantially

more vulnerable to injury from another source than he or she would have been in the absence of

the state intervention."  Schieber, 320 F.3d at 416; see also Kneipp v. Tedder, 95 F.3d 1199,

1201 (3d Cir. 1996).  In order to prevail on the state created danger theory, a plaintiff must

establish all of the following elements:

> (1) the harm ultimately caused to the plaintiff was
> foreseeable and fairly direct;
> (2) the state actor acted with a degree of culpability that
> shocks the conscience;
> (3) a relationship between the state and the plaintiff existed
> such that "the plaintiff was a foreseeable victim of the defendant's
> acts" . . . ; and
> (4) a state actor affirmatively used his or her authority in a
> way that created a danger to the citizen or that rendered the citizen
> more vulnerable to danger than had the state not acted at all.

Bright v. Westmoreland Cnty., 443 F.3d 276, 281 (3d Cir. 2006).  I find that plaintiff's claim

fails to satisfy the second and fourth elements of the Bright test and will discuss each in turn.

In requiring that the state actor's degree of culpability 'shock the conscience', the Court

in Bright modified the previous standard Kneipp laid down, which merely required that the state

actor "acted in willful disregard for the plaintiff's safety."  Rivas v. City of Passaic, 365 F.3d

181, 194 (3d Cir. 2004), citing Kneipp 95 F.3d at 1208.  Under the second prong of the state-

created danger doctrine, the standard of culpability required to shock the conscience varies with

the time that state actors have to deliberate.  This is the same standard of culpability in Due

Process claims outside the state-created danger doctrine.  See Rivas, 365 F.3d at 195–96;

Sanford v. Stiles, 456 F.3d 298, 309 (3d Cir. 2006).  In circumstances involving something less

than a "split-second" decision but still more urgent than an "unhurried judgment" such as those

requiring the state actor to act "in a matter of hours or minutes" which the Court terms "hurried

deliberation", defendants must "consciously disregard[ ] a great risk of serious harm" in order for

their actions to shock the conscience.  Sanford, 456 F.3d at 310.

As I previously discussed, the officers' actions during the incident in light of the exigent

circumstances do not reveal that they consciously disregarded a great risk of serious harm to

Gonzalez.  Plaintiff therefore fails to establish the second prong of the Bright state-created

danger exception.

The last prong of the Bright test requires that plaintiff's harm would not have occurred

"but-for" defendant officers' affirmative actions.  See Ye v. United States, 484 F.3d 634, 642–43

(3d Cir. 2007).  Plaintiff cites the Court of Appeals' opinion in Rivas, 365 F.3d at 197, for the

proposition that "[t]he last element . . . of the Kneipp test asks whether the state actor used his or

her authority to create an opportunity, which otherwise would not have existed, for the specific

harm to occur." Plaintiff erroneously interprets this element as setting forth a "create an opportunity" test for harm. See Dkt. No. 12 at 42. To the contrary, the Court of Appeals has reiterated on multiple occasions that the test for determining a claim asserted under the 'state-created danger' doctrine is that of "but-for" causation. See Rivas, 365 F.3d at 197, noting that the test asks "[w]ere it not for [the state's] acts" the injury would not have occurred; Kneipp, 95 F.3d at 1209, finding it conceivable that "but for the intervention of the police" harm would not have occurred and that a jury could find that the police intervention "greatly increased" the "risk of injury" so as to satisfy the fourth element of the test; Kaucher v. Cnty. of Bucks, 455 F.3d 418, 432 (3d Cir. 2006), finding that "[t]here must be a direct causal relationship between the affirmative act of the state and plaintiff's harm" for the fourth element.

Plaintiff alleges that the officers' actions in preventing her from transporting her daughter to the hospital created the opportunity for decedent's anoxic brain injury and death that would not have otherwise occurred. Dkt. No. 12 at 45. However, the "but-for" causation requirement is stringent and necessitates more than defendants' alleged creation of an "opportunity for harm"; it requires that defendants' actions were the direct cause of plaintiff's injury. Plaintiff has not shown that to have been the case here. Plaintiff's expert witness Dr. Christopher Moen testified that Gonzalez's death was caused by the exacerbation of her asthma by multiple factors. He states in his expert report:

> Tabitha Gonzalez's unfortunate death occurred from a severe and rapidly progressing exacerbation of her chronic asthma. Patients with asthma are at risk of developing exacerbations from a wide variety of sources. Multiple causative agents have been identified as the sources of these exacerbations, including allergy, inhaled gases or particular matter . . . . Such exacerbation appears to have occurred to Tabitha Gonzalez.

Dkt. No. 12-20. Gonzalez's death was caused by the exacerbation of her underlying medical condition from a possible "wide variety of sources." Id. The anoxic brain injury and death that Gonzalez suffered was not the direct result of the officers' actions that plaintiff claims delayed her family from transporting her to the hospital. Therefore, I find that plaintiff also fails to establish the last prong of the 'state-created' danger exception and I will grant summary judgment in favor of defendants with respect to her claims of violations of her and decedent's liberty interests.

Because I find that the officers neither had a special relationship with the decedent nor created the danger of her injury and therefore did not have an affirmative obligation to aid her, I will not discuss whether defendant officers are entitled to qualified immunity.

### C.      Cruel and Unusual Punishment

I will dismiss plaintiff's claim that defendants violated decedent's right to be free of cruel and unusual punishment. "The Cruel and Unusual Punishments Clause was 'designed to protect those convicted of crimes' and consequently the Clause applies 'only after the State has complied with the constitutional guarantees traditionally associated with criminal prosecutions.'" Whitley v. Albers, 475 U.S. 312, 318 (1986), citing Ingraham v. Wright, 430 U.S. 651, 664 (1977). Plaintiff does not aver that decedent was ever convicted and confined by defendant officers and her claim is therefore without merit.

I will grant summary judgment in favor of defendants with respect to Counts I and II of plaintiff's complaint.

### II.      Count III—Monell Liability

Plaintiff claims that the City of Philadelphia had a policy and custom of "allowing police officers to disregard" family/parental rights and individuals' rights to seek emergency medical

treatment, and failed to train defendant officers on the same, causing her and decedent's injuries. Dkt. No. 6 at ¶¶ 31-38. Plaintiff also claims that the City was deliberately indifferent in failing to adopt policies necessary to prevent constitutional violations, leading to her injuries. See Dkt. No. 12 at 46-48. In order to impose liability on a local governmental entity for failing to act to preserve constitutional rights, a § 1983 plaintiff must establish that: (1) she possessed a constitutional right of which she was deprived; (2) the municipality had a policy; (3) this policy "amounts to deliberate indifference" to the plaintiff's constitutional right; and (4) the policy is the "moving force behind the constitutional violation." City of Canton, Ohio v. Harris, 489 U.S. 378, 389–91 (1989). "'[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown, 520 U.S. 397, 410 (1997).

Defendant City argues that plaintiff cannot satisfy the burden of proof as required by Monell v. Department of Social Services of City of New York, 436 U.S. 658 (1978) and its progeny to hold the City liable in her § 1983 action. I agree with defendant. As I have previously discussed, plaintiff has not met her burden to establish a constitutional injury that she suffered. Even if she had, I also find that she fails to satisfy the other elements required for a finding of § 1983 liability under Monell.

## A.     Policy, Custom or Practice

A policy is a "deliberate choice to follow a course of action . . . made from various alternatives by the official or officials responsible for establishing final policy." Pembaur v. City of Cincinnati, 475 U.S. 469, 483–84 (1986), superseded in part by statute, Civil Rights Act of 1991, Pub. L. No. 102-166, 105 Stat. 1072 (1991), as recognized in Francis v. Carroll, 659 F.Supp.2d 619, 626 (D. Del. 2009). A course of conduct not expressly authorized by law

constitutes "custom" with the force of law where it is "permanent" and "well settled." Monell, 436 U.S. at 691, citing Adickes v. S. H. Kress & Co., 398 U.S. 144, 167–68 (1970). To prevail on a municipal liability claim under a theory of deliberate indifference, a plaintiff must "'establish a municipal custom coupled with causation—i.e., that policymakers were aware of similar unlawful conduct in the past, but failed to take precautions against future violations, and that this failure, at least in part, led to [plaintiff's] injury.'" Beck v. City of Pittsburgh, 89 F.3d 966, 972 (3d Cir. 1996), quoting Bielevicz v. Dubinon, 915 F.2d 845, 851 (3d Cir. 1990); see also id., noting that the 'deliberate indifference' standard is adopted by courts in policy and custom contexts.

Plaintiff fails to establish the existence of a policy or custom of the City. Plaintiff alleges that the City has a practice of "allowing police officers to disregard" family/parental and individual rights to seek medical treatment that is "so widespread that it is a de facto policy of the City of Philadelphia, thereby constituting its method of operation and force of law." Dkt. No. 6 at ¶ 36. However, plaintiff fails to support her allegations with any facts establishing the existence of such a policy or custom. Plaintiff also fails to present any evidence regarding a pattern of alleged similar violations in the past, or the City's awareness of such violations that would put it on constructive notice to take future precautions. In the absence of such notice, the "deliberate indifference" necessary to trigger municipal liability is absent. See Bryan Cnty., 520 U.S. at 407.

**B.      Failure to Adopt a Policy**

A failure to adopt a policy can amount to deliberate indifference towards an individual's constitutional rights. See Carter v. City of Phila., 181 F.3d 339, 357 n.61 (3d Cir. 1999), citing Canton, 489 U.S. at 391. 'Deliberate indifference' requires proof that a municipal actor

"disregarded a known or obvious consequence of his action." Bryan Cnty., 520 U.S. at 410.

When injury is caused by such indifference, liability may arise. Carter, 181 F.3d at 357 n.61.

Plaintiff points to Directive 63, the City's Memorandum 99-2 and the deposition of Sergeant Paul Starrs to support her claim that the City failed to adopt policies on the responsibility of police in transporting individuals suffering from a medical emergency to the hospital. See Dkt. No. 12 at 45-48. Directive 63 specifies that persons with a "serious penetrating wound or a blunt trauma to the body will be transported to the nearest accredited trauma center." Dkt. No. 12-23. The Directive was not applicable to Gonzalez because she had neither a penetrating wound nor blunt trauma to the head. See Dkt. No. 11-7 at 22:6-20. Plaintiff adduces expert testimony in support of her allegation that Directive 63 is problematic because its inapplicability to situations such as Gonzalez's leads to the violation of individuals' rights. Dkt. No. 12-25. Plaintiff also points to Starrs' testimony he was "not aware of any policies or procedures" "[o]r even training" in regard to the parents' right to the care, custody, control and medical treatment of their children" to support her argument that the City failed to adopt appropriate policies. Id. at 28:15-23; 16:1-6.

Here plaintiff again does not support her claim with any facts suggesting that City policymakers were aware of similar allegedly unlawful conduct in the past but failed to take precautions against future violations, which directly led to her injury. She thus fails to establish the requisite deliberate indifference. See Bryan Cnty., 520 U.S. at 410; see also Beck, 89 F.3d at 972. In addition, plaintiff fails to show that her claimed injuries were actually caused by the City's failure to adopt a policy. See Carter, 181 F.3d at 357 n.61., citing Canton, 489 U.S. at 391. As the Court of Appeals has pointed out, "it is not enough for a plaintiff to argue that the constitutionally cognizable injury would not have occurred if [the defendant] had done more than

he or she did." <u>Sample v. Diecks</u>, 885 F.2d 1099, 1118 (3d Cir. 1989).  The plaintiff must identify a "specific defalcation" that caused the "ultimate injury."  <u>Id.</u>  Here plaintiff simply asserts that the City failed to adopt "appropriate policies," which produced the claimed constitutional violations.  Dkt. No. at 48.  This is insufficient to establish the "close causal relationship" required for municipal liability.  <u>See Sample</u>, 885 F.2d at 1118.

C.    **Failure to Train**

A municipality may be held liable under § 1983 if its failure to train its employees results in constitutional violations.  <u>Canton</u>, 489 U.S. at 379.  "A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turn on a failure to train."  <u>Connick v. Thompson</u>, 131 S.Ct. 1350, 1359 (2011).  The inadequacy of training may serve as a basis for municipal liability "only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact."  <u>Id.</u> at 388.  "Failure to train . . . municipal employees can ordinarily be considered deliberate indifference only where the failure has caused a pattern of violations."  <u>Berg v. Cnty. of Allegheny</u>, 219 F.3d 261, 276 (3d Cir. 2000) (per curiam), <u>citing</u> <u>Bryan Cnty.</u>, 520 U.S. at 408–09.  Finally, for liability to attach in this circumstance "the identified deficiency in the training program must be closely related to the ultimate injury."  <u>Canton</u>, 489 U.S. at 391.

In this case, plaintiff adduces no evidence of prior incidents that would suggest that the City had actual or constructive notice of incidents of medical emergencies where police disregarded the rights of those with whom they came into contact.  <u>Connick</u>, 131 S.Ct. at 1354.  In the absence of evidence suggesting a pattern of similar violations, a single violation in "a narrow range of circumstances" may suffice only if it is a "highly predictable consequence" of a city's decision not to train officers.  <u>See id.</u> at 1361, <u>citing</u> <u>Bryan Cnty.</u>, 520 U.S. at 397, 409.

The Supreme Court in <u>Canton</u> posited a hypothetical example of single-incident liability being that of a city that deploys its armed police force into the public to capture fleeing felons without training them on the constitutional limitation on the use of deadly force. <u>Canton</u>, 489 U.S. at 390, n.10. In <u>Connick</u>, the Supreme Court clarified that the "obvious need" for specific legal training in the <u>Canton</u> hypothetical arose because "[t]here is no reason to assume that police academy applicants are familiar with the constitutional constraints on the use of deadly force" and "in the absence of training, there is no way for novice officers to obtain the legal knowledge they require." <u>Connick</u>, 131 S.Ct. at 1361. The Supreme Court clearly stated that "[t]he <u>Canton</u> hypothetical assumes that the armed police officers have no knowledge at all of the constitutional limits on the use of deadly force." <u>Id.</u> at 1363.

This case differs from the <u>Canton</u> hypothetical in that City officers are trained in the Police Academy on CPR, first aid and the recognition of life-threatening emergencies.[17] Dkt. No. 11-7 at 14:19-18:5. The officers here are presumed to be familiar with the procedures and actions available to address a medical emergency. "[S]howing merely that additional training would have been helpful in making difficult decisions does not establish municipal liability." <u>Connick</u>, 131 S.Ct. at 1361. While additional training may have aided defendant officers in providing medical assistance to Gonzalez, its absence is insufficient to establish municipal liability. <u>See</u> <u>Canton</u>, 489 U.S. at 391 <u>noting</u> that it will not suffice to prove "that an injury or accident could have been avoided if an [employee] had had better or more training, sufficient to equip him to avoid the particular injury-causing conduct."

---

[17]    Starrs testified that while at the Police Academy, cadets are trained in a seven or eight-day course on CPR and first aid, and again every two years in CPR and every three years in first aid. Dkt. No. 11-7 at 14:19-18:5.

I find that this case is not a case of single-incident liability that the Supreme Court posited in <u>Canton</u> as a possible exception to prove deliberate indifference to train in the absence of a pattern of violations.

Plaintiff has not met her burden to establish the City's liability under <u>Monell</u>. I will grant summary judgment in favor of defendants with respect to Count III of plaintiff's complaint.

## III. Count IV—False Imprisonment

Plaintiff's complaint also asserts a claim for false imprisonment. Defendant's motion for summary judgment clearly seeks dismissal of all of plaintiff's claims, although it does not separately address her claim for false imprisonment. <u>See</u> Dkt. No. 11 at 2, 3. To establish a claim for false imprisonment under Pennsylvania law, plaintiff must show that: (1) one acts intending to confine another with boundaries fixed by the actor; (2) such act results in such confinement of the other, and; (3) the other is conscious of the confinement or is harmed by it. <u>Pennoyer v. Marriott Hotel Servs., Inc.</u>, 324 F. Supp. 2d 614, 619–20 (E.D. Pa. 2004) <u>citing</u> <u>Gagliardi v. Lynn</u>, 285 A.2d 109, 111 n.2 (Pa. 1971). The confinement must be complete within the boundaries fixed by the defendant. <u>Id.</u> If there is a known safe means of escape involving only a slight inconvenience, there is no false imprisonment. <u>Id.</u> There must also be verbal threat to effect the confinement unless physical force or barriers are used. <u>Id.</u> Finally, plaintiff must make some request to leave which is denied by the defendant. <u>See also</u> <u>Park v. Veasie</u>, No. 3:09-CV-2177, 2012 WL 1382222, at *16 (M.D. Pa. Apr. 20, 2012).

Plaintiff claims that she was prevented from accessing the area where her daughter lay. The obvious import of this allegation is that plaintiff was free to go anywhere else. Her testimony that she was able to "move[ ] away" from the officers indicates that she was not confined within any demarcated boundaries allegedly set by the police officer. Dkt. No. 11-4 at

118:10-14. Therefore, I do not find that plaintiff was falsely imprisoned. Similarly, Gonzalez could not have been falsely imprisoned when unconscious and incapable of perceiving any confinement or of making a request to leave of the police officers.

Accordingly, I will grant summary judgment to defendants with respect to Count IV of plaintiff's complaint.

An appropriate Order follows.